[Cite as *In re B.L.*, 2022-Ohio-3072.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: B.L.

:
:
: Appellate Case No. 29440
:
: Trial Court Case No. C-2021-000071-
: 0D,0F
:
: (Appeal from Common Pleas Court-
: Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of September, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant
Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division,
Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
  Attorney for Plaintiff-Appellee, Montgomery County Children Services

P.J. CONBOY, II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
  Attorney for Defendant-Appellant, Mother

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} A.S. ("Mother") appeals from a judgment terminating her parental rights and awarding permanent custody of her daughter, B.L., to Montgomery County Department of Job and Family Services – Children Services Division ("MCCS"). According to Mother, the trial court abused its discretion in awarding permanent custody to MCCS because Mother had made progress and was continuing to work her case plan. Mother therefore contends that the trial court should have granted MCCS an extension of temporary custody rather than terminating her parental rights. The alleged father, R.L. ("Father"), has not appealed.

{¶ 2} For the reasons discussed below, Mother's assignment of error is without merit. Accordingly, the trial court's judgment will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On January 8, 2021, MCCS filed an abuse and dependency complaint in juvenile court, alleging that MCCS had received a referral reporting that Mother's child, B.L., had been born at Mother's home on January 2, 2021. At the time, the home had no heat or electricity. Mother also had received no prenatal care and was positive for cocaine when drug-tested on arrival at a hospital. In addition, Mother admitted during her hospitalization that she had used cocaine, had used alcohol during the first trimester of her pregnancy, and had no heat or electricity in her home. B.L. tested positive for cocaine, was in the neonatal intensive care unit at the hospital, and had hypothermia from being in a home with no heat and electricity. The complaint further alleged that three of Mother's children had previously been placed in MCCS's permanent custody and that

MCCS had filed for permanent custody of a fourth child.

{¶ 4} On the same day, MCCS filed for an ex parte order of interim temporary custody because B.L. was due to be released from the hospital. The court ordered a shelter care hearing for January 8, 2021, appointed a guardian ad litem ("GAL") for B.L., and set the matter for ex parte review on January 11, 2021.

{¶ 5} Following the review hearing (at which both Mother and Father appeared), the court granted interim temporary custody to MCCS and granted supervised visitation for Mother. A pretrial was set for March 5, 2021. The court then appointed counsel for Mother.

{¶ 6} On February 8, 2021, MCCS filed an initial case plan for B.L. and an amended case plan for Mother's other child, B.S., who had been born in September 2019 and was in MCCS's custody. The case plan noted Mother's history of drug use and domestic violence, the child abuse and neglect in Mother's own childhood, Mother's unaddressed bipolar disorder diagnosis, and the fact that Mother was not actively engaged in any services. The case plan outlined various requirements, including that Mother would: (1) sign releases of information; (2) complete domestic violence classes and demonstrate skills learned; (3) obtain safe and stable housing with working utilities; (4) maintain adequate legal and verifiable income; (5) complete a drug and alcohol assessment and follow through with recommendations; (6) refrain from taking illegal substances and submit to random drug screens; (7) complete a mental health assessment and follow recommendations; and (8) complete parenting classes and demonstrate skills during visitation.

{¶ 7} A semi-annual review ("SAR") filed on March 5, 2021, stated that Mother had not visited B.L. since the child was released from the hospital and had made no progress on her case plan. After the pretrial, the court set an adjudication and disposition hearing for March 22, 2021. A GAL report filed on March 22, 2021, recommended that MCCS be granted temporary custody, that B.L. remain in her current placement, and that Mother be given supervised visitation if she asked for it.

{¶ 8} After the hearing on March 22, 2021 (at which both Mother and Father appeared), the court filed an entry finding that B.L. was a dependent and abused child. The court awarded temporary custody to MCCS, adopted the previously-filed case plan, and set an annual review for December 8, 2021. At that point, four of Mother's children (including B.S.) were in MCCS's permanent custody, and Father had not yet established paternity for B.L.

{¶ 9} On June 2, 2021, MCCS filed a motion seeking permanent custody of B.L. The motion noted, among other things, that Mother and Father had visited B.L. only twice since B.L.'s release from the hospital, that Father had not established paternity, that Mother had not complied with her case plan, that MCCS had obtained permanent custody of Mother's other children, with the most recent decision (concerning B.S.) having occurred on March 3, 2021, that B.L. was doing well in her current foster care home, where she had been placed with her sister, that the foster parents were willing to adopt, and that the parents were unfit/unable to care for B.L.

{¶ 10} An initial adjudicatory hearing was held on July 14, 2021, at which both Mother and Father were present. Father still had not established paternity, and Mother

refused to communicate with her attorney. As a result, the court granted a request from Mother's attorney to withdraw from the case and said it would appoint new counsel. The court set discovery deadlines, a final pretrial for October 5, 2021, and a dispositional hearing for October 12, 2021. New counsel was later appointed for Mother.

{¶ 11} On September 1, 2021, MCCS filed another SAR. This document stated that Mother had not addressed case plan activities, was non-compliant in meeting monthly with the caseworker, and had visited B.L. only four times since January 2021. A case plan amendment was filed on September 21, 2021, and reflected that MCCS was seeking permanent custody of B.L. On October 6, 2021, the court approved the change to the plan.

{¶ 12} On October 12, 2021, the GAL filed a report and recommendation. The GAL noted that Mother had stable housing and had income through Social Security. However, Mother admitted that Father, with whom she was living, abused her mentally and physically. Despite this, Mother said she would not end the relationship. Mother had not engaged in domestic violence education, and while she had scheduled parenting classes, she had not yet begun to attend. In addition, Mother had not addressed concerns about her substance abuse and mental health. GAL Report (Oct 12, 2021), p. 2. Father had repeatedly said that he was not interested in either establishing paternity or having any contact with B.L. *Id.* at p. 3. B.L. was doing well in the foster home; the foster parents had recently adopted B.L.'s sister, and they wanted to adopt B.L. as well. *Id.* at p. 1. The GAL recommended that it would be in B.L.'s best interest to grant permanent custody to MCCS and to keep B.L. in her current placement. *Id.* at p. 4.

{¶ 13} At the October 12, 2021 custody hearing, a magistrate heard testimony from B.L.'s foster mother and the MCCS caseworker. The GAL was present for the testimony. However, Mother left at the beginning of the caseworker's testimony. At that time, Mother said she would not be participating any further in the hearing, but would still like to contest the permanent custody motion. *See* Oct. 12, 2021 Transcript of Proceedings ("Tr."), p. 42. Father did not appear for the hearing.

{¶ 14} On November 18, 2021, the magistrate filed a decision finding that a grant of permanent custody would be in B.L.'s best interest.[1] Mother then filed objections and supplemental objections to the magistrate's decision, and MCCS responded. Father did not file any objections.

{¶ 15} On March 11, 2022, the judge overruled Mother's objections and granted permanent custody of B.L. to MCCS. Mother timely appealed from the judgment; Father did not appeal.

II. Alleged Abuse of Discretion in Grant of Permanent Custody

{¶ 16} Mother's sole assignment of error states that:

The Trial Court Abused Its Discretion in Granting MCCS's Motion for Permanent Custody.

{¶ 17} Mother contends that the trial court abused its discretion by granting permanent to MCCS. According to Mother, she was not given enough time to work on

---

[1] The magistrate's decision was not initially included with the record transmitted to our court. After we ordered the record to be supplemented, a supplemental summary of docket and journal entries, which included the November 18, 2021 Magistrate's Decision, was filed on August 12, 2022. We have reviewed the decision.

her case plan. Mother argues that, instead, the court should have extended temporary custody, which would have let Mother complete her case plan goals.

{¶ 18} "The United States Supreme Court has stated that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Ohio has also held that "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.)

{¶ 19} However, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App.1974). "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *B.C.* at ¶ 20.

{¶ 20} MCCS's permanent custody motion was brought pursuant to R.C. 2151.413, R.C. 2151.414(B)(1)(a), and R.C. 2151.414(E)(1), (2), (4), (10), (11), and (16). Motion for Commitment to the Permanent Custody of MCCS (June 2, 2021), p. 1.

{¶ 21} As pertinent here, under R.C. 2151.414, "courts use a two-part test when deciding motions seeking an award of permanent custody to a public services agency. This statute requires courts to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2)

* * * the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8. *See also* R.C 2151.414(B)(1)(a)-(d).

{¶ 22} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 23} In overruling Mother's objections to the magistrate's decision, the trial court stated that "multiple factors existed under R.C. 2151.414(E)" which indicated that B.L. could not be placed with her parents within a reasonable time or should not be placed with them. The relevant factors were those in R.C. 2151.414(E)(1), (2), (4), and (11). Judge's Final Appealable Order ("Order") (Mar. 11, 2022), p. 5-6. The court then conducted the second part of the analysis. After considering the factors listed in R.C. 2151.414(D), the court found that B.L.'s best interest would be served by granting permanent custody to MCCS. *Id.* at p. 6-8.

{¶ 24} We will not overturn a juvenile court's decision to terminate parental rights "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re Forrest S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995). "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (which applied an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 25} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), quoting *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable," rather than being "unconscionable or arbitrary." *Id.*

{¶ 26} Furthermore, "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Specifically, since "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* This discretion, while broad, is "not absolute,"

however, and is guided by statutory language. *Id.*

**{¶ 27}** With these standards in mind, we will begin our discussion with the trial court's findings under R.C. 2151.414(E). Notably, the trial court needed only to find that one or more factors applied. Here, the court listed four factors.

### A. R.C. 2151.414(E) Factors

#### 1. Failure to Remedy Conditions Causing Placement Outside Home

**{¶ 28}** The trial court found that B.L.'s parents had "continuously and repeatedly failed to substantially remedy the conditions causing the child to be placed outside the child's home." Order at p. 5. In this regard, R.C. 2151.414(E) states that a court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to

resume and maintain parental duties.

{¶ 29} The trial court considered all these matters, pointing to Mother's failure to complete a mental health assessment, a drug and alcohol assessment, and parenting classes, despite agency referrals. Order at p. 5. The court's finding was supported by competent, credible evidence. In addition to the matters already mentioned, the testimony of Mother's caseworker, Chelsea, reflected Mother's lack of progress.

{¶ 30} According to Chelsea, she had been Mother's caseworker on and off for two years and had been reassigned to Mother in September 2020. Tr. at p. 43-44. This would have been before B.L.'s birth and about a year before the October 2021 permanent custody hearing. After being reassigned, Chelsea did not have contact with Mother, other than seeing her at hearings, until May 2021, which was five months after B.L. was born. *Id.* at p. 44-45.

{¶ 31} Chelsea was able to successfully obtain contact with Mother in May 2021. She had previously tried to make contact through phone calls and text messages and by leaving letters at Mother's house. Caseworkers are required to make three face-to-face attempts at contact per month, and Chelsea did that each month before May 2021. *Id.* at p. 45. After May, Chelsea met with mother each month other than in July 2021. *Id.* at p. 46.

{¶ 32} Chelsea met with Mother in May at Mother's home, which Mother had only had for a month or two. The two-bedroom home was safe and appropriate. Before that, Mother had lived in Father's home, which had no electricity or water. Mother told Chelsea that she had gotten her current home to try and get B.L. back. However, Mother

said if she did not succeed, she would move back to the house that had no working utilities. *Id.* at p. 46-47. At that house, Mother and Father had to go to the bathroom in a bucket. *Id.* at p. 49. Chelsea had concerns about Mother going back to the prior home. *Id.* at p. 50. Mother also documented in May 2021 that she was receiving SSI, so she did have a source of income. *Id.* at p. 51.

{¶ 33} In May 2021, Mother told Chelsea that she was having weekly phone therapy with South Community. However, when Chelsea contacted South Community, she was informed that Mother had been terminated from therapy in March 2021 for noncompliance. South Community confirmed that Mother had been diagnosed with post-traumatic stress disorder, depression, and alcohol and cocaine dependency. After May 2021, Mother did not report any other mental health services that she had obtained. Tr. at p. 53-54. Mother also never completed a drug and alcohol assessment. *Id.* While Mother said she planned to re-engage with South Community, she never did. *Id.* at p. 55.

{¶ 34} In May 2021, Mother also told Chelsea that she could not find any parenting classes to attend. Mother's reasoning was that this was because of COVID. Chelsea later made referrals for parenting classes, and Mother was supposed to start classes on September 14, 2021. However, Mother then called and said she was not going to be able to start the class because she had "some other obligation." *Id.* at p. 55-56.

{¶ 35} Chelsea made another referral for Mother to start parenting classes the week before the October 12, 2021 custody hearing, and Mother did attend the first class. Nonetheless, Mother told Chelsea that she did not participate in the class. *Id.* at p. 56.

Mother's explanation for her failure was that she did not want people knowing her business.   *Id.* at p. 57.

{¶ 36} In addition, Mother did not take any domestic violence classes.   Mother told Chelsea that she could not participate because no classes were being offered due to COVID.   However when Chelsea contacted Artemis, where Mother had been referred, she was told that while Artemis was not having in-person classes because of COVID, Artemis had continuously offered virtual classes.   Tr. at p. 57-58.   When Chelsea told Mother this and gave her the number, Chelsea said she would call Artemis.   There was never any verification that Mother did call.   *Id.* at p. 58.

{¶ 37} B.L.'s foster mother, Angela, provided supervised visitation for Mother between March 2021 and the time of the hearing.   *Id.* at p. 13-14.   Based on her observations, Angela had concerns about Mother's mental health and about domestic violence.   *Id.* at p. 26.   Mother repeated the same things a lot and told the same stories. And during the August 2021 visit, Mother showed Angela an "app" on her phone where she talked to ghosts.   *Id.* at p. 21.

{¶ 38} Furthermore, on three occasions that summer, Mother showed Angela marks on her body.   The first time was in early July 2021, when Mother showed Angela a mark on her lip and said Father had hit her in the face.   *Id.* at p. 22-23.   The second injury was also in July and involved a burn on Mother's arm.   Mother said this was from a crack pipe and that Father had burned her.   *Id.* at p. 23-24 and 36.   In August 2021, Mother showed Angela "three good scrapes on the left side of her stomach."   *Id.* at p. 24. Mother said Father had pushed her into something.   In addition, Mother mentioned to

Angela that she had been strangled, had passed out, and had been lying on the floor. Mother stated this happened often when Father got home from work.   *Id.* at p. 24-25. The day Mother told Angela about the strangling incident was the day of the October 2021 permanent custody hearing.   *Id.* at p. 25.

{¶ 39} Thus, while Mother did obtain suitable housing and documented some income, she made no effort to take advantage of programs that would have aided in remedying the reasons why B.L. was placed outside her home.   Mother's efforts over the course of many months were not even minimal, and her problems clearly persisted.

{¶ 40} Father's efforts were also less than minimal.   He had one case objective, which was to establish paternity.   Tr. at p. 61.   Had Father done that and reached out to the caseworker, further case plan objectives could have been established.   *Id.*   Mother also refused to give Father's phone number to the caseworker.   *Id.* at p. 62.

### 2.    Chronic Mental Illness and Chemical Dependency

{¶ 41} The court's second finding was under R.C. 2151.414(E)(2), which states that a finding shall be made when:

> Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent * * * is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the

Revised Code.

**{¶ 42}** There is no question that Mother had a severe chemical dependency and made no effort to address it during her lengthy involvement with MCCS. Mother also made no effort to address her significant and chronic mental health issues, and there was no indication that she ever intended to do so. Consequently, the court's reliance on this ground was supported by competent, credible evidence.


### 3. Lack of Commitment to the Child

**{¶ 43}** The trial court further relied on the factor in R.C. 2151.414(E)(4), which provides that a finding shall be made when:

> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

**{¶ 44}** As indicated, Mother was allowed supervised visitation. After B.L. was released from the hospital to the foster parents on January 8, 2021, Mother did not thereafter visit B.L. until sometime in March 2021. Tr. at p. 59. Between that time and June 2, 2021, when MCCS filed for permanent custody, Mother visited B.L. "maybe one or two" times. *Id.* After the permanent custody motion was filed, Mother visited more, at least once every other week. *Id.* From March until the time of the custody hearing (or about seven months), Mother had a total of 10 to 12 visits, six of which occurred between June 2 and October 12, 2021. *Id.* at p. 14-15.

{¶ 45} B.L.'s foster mother, Angela, had cared for B.L. since B.L. was released from the hospital. *Id.* at p. 8. Angela supervised all of the visits, which primarily occurred in a park. During visits, Mother told Angela that she had medical issues that made her too weak to walk around with B.L. Mother also said her arms were not strong enough to hold B.L. At times, Mother's arms got weak, B.L. would slip, and Mother had to catch B.L. on her lap. *Id.* at 17-18. Angela observed B.L. slip in this way on more than one occasion. This was more common than uncommon. *Id.* at p. 19. Because B.L. was only nine months old, Angela was concerned about Mother's ability to take care of B.L., due to mother's physical health. *Id.* at p. 26-17.

{¶ 46} Angela also noticed that Mother became aggravated very easily, and when B.L. cried, Mother asked what was wrong with B.L. This occurred pretty much at every visit. *Id.* at p. 20. In addition, Angela stated that, based on her observations, she did not believe Mother and B.L. were bonded. At the beginning of visits, B.L. cried until she got used to the situation. At that point, B.L. was in a developmental stage in which she began to cry upon seeing unfamiliar faces and continued until she became familiar with them. *Id.* at p. 28.

{¶ 47} The caseworker, Chelsea, was present during two visitations. Chelsea had similar observations about Mother's parenting. Chelsea found that Mother had a hard time getting B.L. to calm down when B.L. was upset, had a difficult time understanding B.L.'s cues, and almost dropped B.L. during a visit. Tr. at p. 60. During both visits, Mother "just didn't want to even make the baby a bottle. She would ask the foster dad to do it." *Id.* at p. 61.

{¶ 48} Further proof of Mother's lack of commitment was shown by the fact that she was not interested in B.L.'s physical problems and well-being. Angela told Mother about two of four well-child visits that occurred; she did not tell Mother about the last two visits because they occurred at the last minute. Angela also told Mother about B.L.'s developmental appointment but left it up to Mother to decide whether to come. This was because the process would take two hours, with several doctors being involved, and Angela knew Mother could "not keep her cool" when she heard what the doctors said. *Id.* at p. 37-38. This was because when Angela previously told Mother of her concerns about B.L.'s health, Mother had texted, "Don't tell me anything unless it's positive." *Id.* at p. 37.

{¶ 49} In addition, Angela told Mother about B.L.'s weekly physical therapy appointments. B.L. had health issues due to Mother's drug and alcohol use during pregnancy and had been diagnosed with neonatal drug and alcohol exposure and ligament laxity. This latter condition meant that B.L. had low muscle tone and her joints were very "hyper-extensive." Tr. at p. 9-11, and 37-38. Despite having been notified, Mother did not attend any doctor or therapy visits.

{¶ 50} Given these facts, the trial court's finding that Mother lacked commitment toward B.L. was supported by competent and credible evidence.


4. Termination of Parental Rights to Other Children

{¶ 51} The final factor the court found was based on R.C. 2151.414(E)(11), which states that a finding shall be made if:

The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

**{¶ 52}** Concerning this factor, the evidence revealed that four of Mother's children had been previously placed in MCCS's permanent custody. These included: M.S. in October 2008; R.F. in April 2009; J.S. in February 2018; and B.S. in 2021. Tr. at p. 62-63. Consequently, competent, credible evidence supported this finding as well.

## B. Best Interest of the Child

**{¶ 53}** The analysis's second prong considers a child's best interest, which includes evaluating "all relevant factors," together with those specifically listed in R.C. 2151.414(D)(1)(a)-(e). We will mention these items only briefly, since our prior discussion covered most of the relevant information.

### 1. Child's Interaction with Others

**{¶ 54}** R.C. 2151.414(D)(1)(a) considers a child's interaction and relationship with various people, including parents, relatives, and foster caregivers. The court

commented that B.L. lacked a significant bond with Mother, had no bond with Father, and was bonded with her foster parents and siblings. For the reasons already stated, we agree. We further note the foster mother's testimony about the care B.L. received at home, including daily extensive physical therapy; how B.L. was thriving in the foster home; and how well B.L. related to and was bonded with her siblings and foster parents. Tr. at p. 8-13, 29, and 31-32.

### 2. Child's Wishes

**{¶ 55}** R.C. 2151.414(D)(1)(b) concerns "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." The trial court noted that B.L. was too young to express her wishes. Order at p. 7. We agree. We also note that after hearing the testimony, the GAL stood by his prior position that permanent custody should be given to MCCS. Tr. at p. 69.

### 3. Custodial History

**{¶ 56}** R.C. 2151.414(D)(1)(c) considers a child's custodial history, which includes whether a child has been in an agency's temporary custody for 12 or more months of a consecutive 22-month period. The trial court noted that B.L. had not been in custody for that period of time, so this factor is not relevant.

### 4. Need for Legally Secure Placement

**{¶ 57}** R.C. 2151.414(D)(1)(d) involves "[t]he child's need for a legally secure

permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." Regarding this factor, the court found that B.L.'s needs could not be achieved without granting permanent custody to MCCS. Order at p. 7. The court stressed several points, including Mother's failure to engage in substance abuse or mental health treatment, concerns over Mother's ability to parent B.L., and Mother and Father's minimal visitation and lack of a bond. The court also noted that B.L. had been with the foster parents since being released from the hospital, was doing well there, and the foster parents wished to adopt her. *Id.* These observations were amply supported by the evidence.

### 5. Applicability of Factors in R.C. 2151.414(E)(7) to (11)

{¶ 58} R.C. 2151.414(D)(1)(e) requires courts to consider if any factors in R.C. 2151.414(E)(7) to (11) apply. The trial court found that (E)(11), regarding prior involuntary termination of parental rights applied. This was correct.

{¶ 59} Based on the above factors, the trial court found, by clear and convincing evidence, that granting permanent custody of B.L. to MCCS would be in the child's best interest. Order at p. 8. Again, we agree. All the court's findings were supported by competent, credible evidence, and the court did not abuse its discretion in awarding permanent custody to MCCS. Accordingly, Mother's assignment of error is overruled.

### III. Conclusion

{¶ 60} Mother's sole assignment of error having been overruled, the judgment of

the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
P.J. Conboy, II
Jeffrey T. Gramza, GAL
R.L.
Hon. Helen C. Wallace